UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                              Cr. No. 05-335 (JMR/FLN)

      Plaintiff,

      v.                                                          **REPORT AND
                                                              RECOMMENDATION**

Bruce W. Betcher,

      Defendant.

_____

Erica H. MacDonald, Assistant United States Attorney.
Thomas H. Shiah for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on November 16, 2005, on Defendant's Motion to Suppress Any Evidence Obtained As A Result Of Any Illegal Searches [#18] and Defendant's Motion to Suppress Any Statements Made By Defendant [#20]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons that follow, this Court recommends that Defendant's Motion to Suppress Any Evidence Obtained As A Result Of Any Illegal Searches [#18] and Defendant's Motion to Suppress Any Statements Made By Defendant [#20] be denied.

## I.    BACKGROUND

### A.    The Search Warrant Issued By the First Judicial District

On September 19, 2005, Officer Stephen Adrian of the Burnsville Police Department applied for a search warrant to search the residence and three automobiles of Defendant Bruce Betcher.  (Ex. 1 at 7.)  Officer Stephen Adrian of the Burnsville Police Department has been a licensed Minnesota Peace Officer for the past 24 years and has been a member of the City of Burnsville Police

Department for the past 18 years.  (Ex. 1 at 3.)  Officer Adrian is a member of the Minnesota Internet Crimes against Children Task Force (MICAC) based out of the Saint Paul Police Department.  (Ex. 1 at 3.)  Officer Adrian's duties associated with the MICAC task force include the investigation of the possession, distribution, and manufacture of pictorial representations of minors engaged in sexual performances in violation of Minnesota Statute §617.247 and the enticement of minors for a sexual performance in violation of Minnesota Statute § 609.352.  (Ex. 1 at 3.)

In 2003 the Bureau of Immigration and Customs Enforcement (ICE) and the Cyber Crimes Center (C3) were conducting an investigation involving violations of the Child Pornography Prevention Act of 1996.  (Ex. 1 at 3.)  The title of this operation is OPERATION FALCON.  (Ex. 1 at 3.)  During this investigation several different undercover ICE agents accessed three different websites and were able to download pictures and videos of children engaged in sexually explicit conduct.  (Ex. 1 at 3-4.)  During this investigation ICE agents also investigated the billing companies that processed the credit card payments made on-line to these websites.  (Ex. 1 at 3-4.)  One of the cardholders of a credit card used at these websites that was uncovered during this investigation was identified by the credit card company as Defendant, Bruce Betcher.  (Ex. 1 at 4-5.)  Defendant's credit card was used to purchase membership to three of the websites identified as containing pictures and/or videos of children engaged in sexually explicit conduct.  (Ex. 1 at 4-5.)  As a result of the investigation, it was determined that Defendant purchased memberships at these websites on March 12, 2003, April 26, 2003, and May 18, 2003.  (Ex. 1 at 4.)

In August 2005 ICE agents executed a search warrant at a residence in Atlanta, Georgia.  (Ex. 1 at 5.)  The search warrant lead to the seizure of a hard drive with approximately 2,200 images

2

of child pornography and child erotica.  (Ex. 1 at 5.)  These images were submitted to the National Center for Missing and Exploited Children (NCMEC) and numerous images were discovered that were not known to NCMEC.  (Ex. 1 at 5.)  The unknown images were taken by three different digital cameras between the time periods of March and October 2004.  (Ex. 1 at 5.)  Further examination of these images indicated a direct connection to Minneapolis and the surrounding area.  (Ex. 1 at 5.)  In particular, one of the images revealed a partial brownie uniform with "Minne" and a troop number with the ending only visible as "07."  (Ex. 1 at 5.)  ICE agents and other members of MICAC began to interview troop leaders for troops belonging to the Greater Minneapolis Council, with troop numbers ending in "07."  (Ex. 1 at 5.)  The troop leaders were shown some of the images, in cropped format with no pornography visible, in an attempt to identify the victims.  (Ex. 1 at 5.)  During the investigation an adult associated with the girl scouts identified one of the prepubescent females from a cropped image.  (Ex. 1 at 5.)  After further investigation the juvenile female was identified as the Defendant's granddaughter.  (Ex. 1 at  5.)

Officer Adrian viewed the images at issue and there were several other prepubescent females in the images with Defendant's granddaughter.  (Ex. 1 at 5.)  The background in some of these images indicated that they were taken in a finished basement, and other pictures showed a background of an envelope with the wording "North * Star Mini-Storage, Space #," and the rest of the envelope was not clear.  (Ex. 1 at 5.)  Next to the envelope was a video recorder, which Officer Adrian believed was a digital video recorder, due to its shape.  (Ex. 1 at 5.)  An employee of North Star mini-storage reported that from November 2003 to November 2004 Defendant rented space #1111, which is located in Burnsville, Minnesota.  (Ex. 1 at 5.)

On September 19, 2005, ICE Special Agent Jessica Begres assisted Paula Pletsch of Dakota

County Social Services in conducting an interview with Defendant's granddaughter. (Ex. 1 at 5.) When shown two of the images at issue, in a cropped format, the female stated that those images were taken in the home of Defendant. (Ex. 1 at 5-6.) One of the images she identified as being in the kitchen of Defendant and the other she identified as being taken in the Defendant's basement following a bath that she took with her sister and her friend. (Ex. 1 at 6.)

Based on this information, Officer Adrian applied for a search warrant with the First Judicial District in the State of Minnesota. (See Ex. 1.) In the application for the search warrant, Officer Adrian requested the Court to authorize the search of Defendant's residence, Defendant's person, as well as the search of a 2001 Ford Taurus, a 2004 Ford Expedition and a 2004 Ford Explorer. (See Ex. 1.) Officer Adrian requested permission to seize particular evidence, including: any images, media, or papers that depict child pornography; digital and video camera equipment; computer system(s), including but not limited to, system components, input devices, output devices, data storage and transmission devices, network devices and/or peripheral devices; media in whatever form, including but not limited to, floppy, compact or DVD disks, optical or magnetic discs, secure digital cards, multi media cards, memory stick media, compact flash cards, video tapes or other items that may be used for the possession and/or distribution of child pornography; papers and effects that tend to show the possession or distribution of child pornography; programs and manuals relating to operating systems, applications and/or peripheral devices; notes and other documentation that may reveal passwords and other data security devices which are designed to restrict access to or hide computer software, documentation or data; computer access codes, usernames, deleted files, e-mail files, chat line logs, log files, configuration files and passwords; documentation relating to the Internet; proof of residency and related documents to show constructive possession of property;

and documents, papers, or contracts related North * Star Mini-Storage Company.  (Ex. 1 at 1.)

**B.    The Search Warrant Issued By the United States District Court, District of Minnesota.**

In addition to this search warrant, ICE Agent Jessica Begres also applied for a search warrant in the United States District Court, District of Minnesota.  (See Ex. 2.)  Jessica Begres is a special agent employed by ICE.  (Ex. 2 at 1.)  Agent Begres has been employed with ICE since April 20, 2003.  (Ex. 2 at 1.)  Previous to April 20, 2003, Agent Begres has been employed with the United States Customs Service since July 2002.  (Ex. 2 at 1.)  Agent Begres is currently assigned to the Special Agent in Charge Office/St. Paul located in Bloomington, Minnesota, and her current assignment includes the investigation of matters involving the online exploitation of children.  (Ex. 2 at 1.)  Agent Begres has participated in numerous investigations, involving both searches and arrests pertaining to these types of investigations.  (Ex. 2 at 1.)  Agent Begres has also received extensive training in computer crime investigation.  (Ex. 2 at 1.)

On September 14, 2005, Agent Begres received a phone call from Senior Special Agent Joyce Shores, who is assigned to C3 and is currently a member of NCMEC.  (Ex. 2 at 8.)  SSA Shores stated that in August 2005 ICE agents had executed a search warrant at a residence in Atlanta, Georgia.  (Ex. 2 at 8.)  SSA Shores told Agent Begres that as a result of that search warrant, over 2000 images of child pornography were found on the hard drive of a computer that was seized.  (Ex. 2 at 9.)  These images were sent to NCMEC and were reviewed by the Child Victim Identification Program ("CVIP").  (Ex. 2 at 9.)  Approximately 78 images of child pornography and child erotica, with at least six prepubescent girls, were not known to CVIP.  (Ex. 2 at 9.)  An analysis of the background of the images led analysts to believe that the images were taken in the Minneapolis, Minnesota area.  (Ex. 2 at 9.)  The images and the NCMEC reports were sent to Agent

5

Begres in an effort to identify the child victims in the images and the individual who created the images.  (Ex. 2 at 9.)  In her application for a search warrant, Agent Begres noted that Defendant was identified as the individual who had taken the images in question.  (Ex. 2 at 9.)

On September 19, 2005, Agent Begres, along with Officer Adrian and other law enforcement officers executed the state search warrant described above.  (Ex. 2 at 9.)  Among other things, the agents seized three computers, two disks, one Sony Handcam, one Olympus digital camera, one Olympus picture card, and at least one page of pictures containing child pornography from Defendant's residence. (Ex. 2 at 10.)  In addition, agents seized eight rolls of undeveloped film from one of the cars searched.  (Ex. 2 at 10.)

Agent Begres personally reviewed the 78 images sent to her by NCMEC for identification. (Ex. 2 at 11.)  Based on her investigation and her familiarity with Defendant's residence, Agent Begres believed that the majority of those images were taken in Defendant's residence.  (Ex. 2 at 11.)  Agent Begres further identified two of the six prepubescent girls in the series of pictures as Defendant's granddaughters.  (Ex. 2 at 11.)  Agent Begres identified another one of the girls in the photographs as one of Defendant's granddaughter's friends.  (Ex. 2 at 12.)  Agent Begres stated metadata, conveying information regarding the camera make and model can sometimes be located within a JPEG file. (Ex. 2 at 12.)  A review of the metadata of four of the JPEG images of children engaged in sexually explicit conduct indicated that an Olympus digital camera was used to create the images.  (Ex. 2 at 13.)  Agent Begres stated in her affidavit that she had interviewed one of Defendant's granddaughters and that the granddaughter had identified herself in the series of photographs, and had also stated that Defendant was the person who took the majority of the photographs in his home.  (Ex. 2 at 13.)  In addition, the granddaughter stated that she had witnessed

6

Defendant download the pictures he took on his home computer.  (Ex. 2 at 13.)

Based on the above information, Agent Begres requested a search warrant to search the three computers, two disks, one Sony Handcam, one Olympus digital camera, one Olympus picture card, and the eight rolls of undeveloped film seized from Defendant's residence pursuant to the state search warrant.  (See Ex. 2.)  Based on Agent Begres' knowledge, training and experience, and from her consultation with other federal agents, she requested the search of the items at issue because she stated that computer files or remnants of such files can be recovered months or years after they have been downloaded onto a hard drive, deleted or viewed on the Internet.  (Ex. 2 at 14-15.)  Agent Begres requested that the search warrant authorize her to use the following search techniques: examination of all the data contained in the computer hardware, software and/or memory storage to view the data and determine whether the data contained child pornography; searching for and attempting to recover any deleted, hidden or encrypted data; surveying various file directories and the individual files they contain; opening files to determine their contents; scanning storage devices; performing key word searches through all electronic storage areas; and/or performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A.  (Ex. 2 at 19-20.)

Attachment A described the items to be seized as: any and all documents or correspondence pertaining to the possession, receipt, distribution or manufacturing of child pornography; any and all images, in any format, of child pornography; any and all addresses, names, and lists of names who may have been contacted by Defendant for the purpose of distributing or receiving child pornography; any and all documents relating to membership in online groups, clubs, or services that provide child pornography; any documents that concern any accounts with an Internet Service

7

Provider or online storage or other remote computer storage; any and all visual depiction of minors, and all documents pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade or transmission, through interstate or foreign commerce, of child pornography.  (Ex. 2 at 1-2.)  A federal magistrate authorized the search warrant on September 27, 2005.  (Ex. 2 at 21.)

### C.      The Interview Of the Defendant By Officer Adrian and Special Agent Begres

During the suppression hearing on this matter, both Officer Adrian and Defendant testified. Defendant testified that when he pulled up to his home on September 19, 2005, he saw vehicles unknown to him and people walking around his home whom he did not know.  Defendant testified that an unknown officer met him on his lawn and informed him that law enforcement were currently searching his residence for child pornography.  Defendant testified that the same officer followed Defendant as he made his way through his garage into the side door of his home.  Defendant testified that he came into the house and saw his wife at the kitchen table.  Defendant testified that his wife immediately told him not to speak with anyone.  At that point the unknown officer from outside was still following the Defendant.  Defendant testified that police officers followed him around his house the entire time the search was being conducted.  Defendant stated that at one point, he went into his office to get an ashtray and an officer asked him what he was doing.  When he replied that he was going to get an ashtray, Defendant was allowed to get the ashtray from the office and another officer followed him into the office, and then returned with him into the living room where Defendant smoked.  Officer Adrian testified that Defendant's movements were controlled in that if Defendant wished to move around the residence, an officer would accompany Defendant.  Officer Adrian further testified that Defendant would get up to look at the caller identification system attached to

the telephone in the kitchen whenever the telephone would ring, and that this occurred several times during the interview. Defendant testified that he was not allowed to actually answer the telephone. Defendant further testified that he did not believe that he was free to leave. Defendant testified that he believed he had to stay at the table although he testified that no one told him that he had to stay at the kitchen table.

Officer Adrian and Special Agent Begres conducted an interview of the Defendant at his residence on September 19, 2005. (Ex. 4 at 1.) Other officers were present in the residence during the interview, executing the search warrant. (Ex. 4 at 1.) Officer Adrian was the primary interviewer. (See Ex. 4.) Officer Adrian began the interview by telling Defendant that his wife told Officer Adrian that she would not speak to the officers without an attorney present. (Ex. 4 at 1.) Officer Adrian told Defendant "we're honoring that request by her." (Ex. 4 at 1.) Officer Adrian further told Defendant that neither he nor his wife were under arrest, and that the officers would "control [Defendant and his wife's] movements in the residence for obvious reasons until [the officers were] done with the search warrant." (Ex. 4 at 1.) Immediately after stating that Defendant's movements would be controlled, Officer Adrian said that Defendant did not have to talk with the officers about anything he chose not to. (Ex. 4 at 1.) Officer Adrian informed Defendant that he would like to interview Defendant, but that it was Defendant's choice "whether or not [he] wanted to be interviewed." (Ex. 4 at 1.) Officer Adrian further continued on, stating that Defendant could talk to the officers in front of his wife, he could say he would rather talk down at the police station, that he would rather talk at his residence, or if he did not want to talk to Officer Adrian at all he did not have to. (Ex. 4 at 1.) After making these statements, Officer Adrian notified Defendant and his wife that their three grandchildren would be removed from the home for a 72-

hour Health and Welfare hold to be reviewed by a judge.  (Ex. 4 at 1-2.)  Officer Adrian informed

Defendant and his wife of their rights regarding the removal of their grandchildren from the home.

(Ex. 4 at 2.)  At no time did Officer Adrian inform Defendant of his <u>Miranda</u> rights.

Further on during the interview, Officer Adrian asked Defendant if he wanted to speak to

Officer Adrian concerning this matter.  (Ex. 4 at 17.)  Officer Adrian told Defendant "again,

reiterating, it has to be on a voluntary basis.  It's your decision.  It will be audio recorded.  I'm

required to do that by law . . . Whatever you tell me, unless you committed a homicide somewhere

. . . I don't, you're not going to be arrested."  (Ex. 4 at 17.)  Officer Adrian continued on by stating

> Okay.  So, you know, once we get done talking, if that's what you want to do, you're
> coming back to your home, et cetera.  You know or whatever the case may be, if you
> [sic] saying you want to do it away from here is what I'm saying.  Okay.  So that's
> your choice. [unintelligible] your wife's made statements on that, she does not want
> to talk to us all without an attorney present.  What you say [unintelligible], you
> yourself is up to you, what you want to do.

(Ex. 4 at 18.)  After Officer Adrian made the above statement, Defendant responded "I guess I don't

have a problem with talking to you, I guess.  'Cause I have the right to not answer a question."  (Ex.

4 at 18.)  Officer Adrian responded to Defendant by stating "Sure you do, yep" and Defendant

responded "You know, so."  (Ex. 4 at 18.)  Before Officer Adrian started asking substantive

questions of Defendant, Officer Adrian again told Defendant's wife "because you exercise [sic] your

right not to have us interview you or show any information, the conversation we have with Bruce

is with us.  You may want to interject, ask questions, do whatever.  I can't answer any of those for

you, because of what you chose to do." (Ex. 4 at 19.)

Thereafter Officer Adrian engaged Defendant in a lengthy interview during which Defendant

made several incriminating statements.  (Ex. 4.)  Defendant admitted to subscribing to child

pornography websites on the internet.  (Ex. 4 at 43-50.)  However, Defendant denied ever taking

pornographic pictures of his grandchildren or their friends.  (Ex. 4 at 55-56; 63-64.)

At one point during the interview, Officer Adrian, Defendant and Agent Begres moved the interview from the kitchen of Defendant's residence to the basement.  (Ex. 4 at 61-62.)  At no time did Defendant request an attorney or ask to stop the interview.  (See Ex. 4.)  At the end of the interview Officer Adrian stated "like we talked about in the very beginning, you know, it was your decision to talk with us voluntarily?" to which Defendant replied "Right."  (Ex. 4 at 76.)  Officer Adrian further asked Defendant "Have I, I or the customs agent said anything to you that has caused you to talk to us against your will?" to which Defendant replied "No."  (Ex. 4 at 76.)  Officer Adrian asked Defendant "And there's nothing we've done, in your opinion, that has been in a threatening manner or anything like that?  Coercing you to talk with us or anything like that?" to which Defendant replied "No."  (Ex. 4 at 76.)  Officer Adrian also asked Defendant whether he believed that he had been treated fairly, and Defendant stated that he had been treated fairly.  (Ex. 4 at 76.)

Defendant was not arrested until several days after the conclusion of this interview. Defendant now moves to Suppress Any Evidence Obtained As A Result Of Any Illegal Searches [#18] and to Suppress Any Statements Made By Defendant [#20].  For the reasons that follow Defendant's Motions are denied.

## II.   CONCLUSIONS OF LAW

### A.   The Search Warrants

Defendant challenges both of the search warrants in this case on their four corners, alleging that each warrant was issued without probable cause.  Searches conducted pursuant to a warrant are reviewed to determine whether the information in the warrant application and supporting affidavit

provided probable cause for the search.  Illinois v. Gates, 462 U.S. 213, 236 (1983).  "Probable

cause exists when, given the totality of the circumstances, a reasonable person could believe there

is a fair probability that contraband or evidence of a crime would be found in a particular place."

United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing Illinois v. Gates, 462 U.S. 213,

236 (1983)).  A court does not evaluate each piece of information independently, but rather

considers all of the facts for their cumulative meaning.  United States v. Allen, 297 F.3d 790, 794

(8th Cir. 2002).  The task of a court issuing a search warrant is "simply to make a practical,

common sense decision whether, given all the circumstances set forth in the affidavit . . . including

the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair

probability that contraband or evidence of a crime will be found in a particular place."  Gates, 462

U.S. at 238; see also United States v. Salter, 358 F.3d 1080, 1084 (8th Cir. 2004).

In reviewing the decision of the issuing court, this Court must ensure that the issuing court

"had a 'substantial basis for . . . conclud[ing] that probable cause existed.'"  United States v.

Oropesa, 316 F.3d 762, 766 (8th Cir. 2003) (quoting Gates, 462 U.S. at 238-39.)  Since reasonable

minds may differ on whether a particular search warrant affidavit establishes probable cause, the

magistrate's determination is accorded great deference.  U.S. v. Wajda, 810 F.2d 754, 760 (8th Cir.

1987) (citing United States v. Leon, 468 U.S. 897, 914 (1984)).

In the present case, there was probable cause to believe that evidence of child pornography

would be found at the Defendant's residence or in Defendant's three automobiles.  Officer Adrian

recited the relevant facts in his application for the search warrant issued by the First Judicial District.

Defendant had been identified as early as 2003 as a person who purchased child pornography off

of the internet.  Based on an independent investigation, images of child pornography were

discovered that were traced to the Minneapolis area. Upon further investigation by Officer Adrian and others, Defendant's own granddaughter was identified as one of the children shown in the child pornography found on the computer hard drive of a suspect in Atlanta, Georgia. In addition, once interviewed, Defendant's granddaughter identified herself in several of the pornographic photographs discovered as a part of the Georgia investigation. Defendant's granddaughter further told investigators that Defendant owned a digital camera and that he was able to download pictures from the camera to his personal computer. Viewing this evidence within the totality of the circumstances, "a reasonable person could believe there is a fair probability that" evidence of the possession or distribution of child pornography would be found in Defendant's residence or in his three vehicles. United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

Furthermore, the federal search warrant was based on all of the above information in addition to the admissions obtained from Defendant during his interview. As discussed in further detail below, these admissions were not the result of custodial interrogation and hence are admissible at trial. Special Agent Begres clearly stated in her affidavit that she was able to positively identify two of the six prepubescent girls in the contraband photographs as Defendant's two granddaughters. Viewing this evidence in the totality of the circumstances, "a reasonable person could believe that there is a fair probability" that evidence of the possession and or distribution of child pornography would be found on Defendant's three personal computers, within his digital cameras, and within the undeveloped rolls of film found in his vehicle. United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

Given the information in both affidavits, a reasonable person could conclude that evidence of Defendant's alleged possession and/or distribution of child pornography could be found in

Defendant's residence, in his vehicles, and on the computers, digital cameras, disks and undeveloped film seized from his residence and vehicle. Under the totality of the circumstances, in both instances the issuing judge had a substantial basis for concluding that probable cause existed to issue the search warrant for the residence, the vehicles, the computers, the digital cameras, the disks, and undeveloped film. Therefore, Defendant's Motion to Suppress Any Evidence Obtained As A Result of Any Illegal Searches [#18] is denied.

**B      The Statement**

**1.      Defendant Was Not In Custody When He Made His Statement**

Pursuant to Miranda v. Arizona, 384 U.S. at 444, "an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir.1990). Any statements taken in violation of this directive are subject to suppression. Miranda, 384 U.S. at 476. Voluntary statements by a suspect not in custody, however, do not require the protection of Miranda. Id. at 478-79. Thus, warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Oregon v. Mathiason, 429 U.S. 492, 495 (1977); United States v. LeBrun, 363 F.3d 715, 720-21 (8th Cir.2004).

A person is "in custody" for Miranda purposes if the person is either under "formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way." Griffin, 922 F.2d at 1347 (emphasis in original); Berkemer v. McCarty, 468 U.S. 420, 428 (1984). The Court examines the extent of the physical or psychological restraints placed on the suspect during interrogation "in light of whether a 'reasonable person in the suspect's position

would have understood his situation' to be one of custody." <u>Griffin</u>, 922 F.2d at 1347 (quoting

<u>Berkemer</u>, 468 U.S. at 442.)  The test is to be applied objectively: if, under the circumstances of a

particular case, the suspect believes his freedom has been curtailed to the same extent an arrest

would have curtailed it, and if the suspect's belief is reasonable, then the suspect is in custody.

<u>Griffin</u>, 922 F.2d at 1347; (citing <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983); <u>Berkemer</u>, 468

U.S. at 440.)  A determination of custody can only be reached upon considering the totality of the

circumstances.  <u>United States v.Axsom</u>, 289 F.3d 496, 500 (8th Cir.2002).

> The relevant factors to be considered in making a determination of custody include:
>
> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

<u>Griffin</u>, 922 F.2d at 1349.

In order to issue a finding of custody a Court need not find that all of the above six factors

are met.  <u>Griffin</u>, 922 F.2d at 1349, (citing <u>United States v. Longbehn</u>, 850 F.2d 450, 452-53 (8th

Cir.1988)).  The first three factors are characterized as mitigating factors, so that the presence of one

or more of these factors tends to mitigate the conclusion that a person was in custody at the time they

were questioned.  <u>Griffin</u>, 922 F.2d at 1349.  Conversely, the last three factors are characterized as

aggravating factors, so that the presence of one or more of these factors weighs in favor of a finding

of custody at the time of questioning.  <u>Id</u>.  When balancing these factors, "a particularly strong

showing with respect to one factor may compensate for a deficiency with respect to other factors."

15

<u>Id</u>. (citing <u>South Dakota v. Long</u>, 465 F.2d 65, 70 (8th Cir.1972)).

The present case is similar to <u>United States v. Czichray</u>, 378 F.3d 822 (8th Cir.2004.)  In <u>Czichray</u>, two agents went to the defendant's residence at 6:30 a.m., identified themselves as FBI agents, and asked to speak with the defendant for "a few minutes."  <u>Id</u>. at 825.  The defendant admitted the FBI agents into his home, and the FBI agents conducted an interview that lasted almost seven hours.  <u>Id</u>.  During that interview, the defendant "was informed several times that his participation was voluntary, and that he was free to ask the agents to leave his home."  <u>Id</u>.  Three hours into the interview the defendant informed the officers that he was late for work, and the officers instructed the defendant to call in sick to work without disclosing the fact that he was being interviewed by the FBI.  <u>Id</u>.  Defendant did so, and during the course of the interview the defendant's telephone rang several times but the officers instructed the defendant not to answer the telephone, and the defendant in fact did not answer his telephone at any time during the interview. <u>Id</u>.  When the defendant moved around his home to use the bathroom and to enter his bedroom, he was accompanied by one of the officers in order to "check the rooms for telephones."  <u>Id</u>.  During the interview the defendant never asked the officers to leave and he never resisted answering their questions.  <u>Id</u>.  At the conclusion of the interview, the defendant signed a written statement acknowledging that he had not been coerced or threatened and that he had not been promised anything in return for his statement.  <u>Id</u>.  The defendant was never threatened with arrest during the interview, and the defendant was not arrested at the conclusion of the interview.  <u>Id</u>.

The Eighth Circuit held in <u>Czichray</u> that the defendant was not in custody.  The Eighth Circuit stated "[w]e have observed that '[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest

16

is not being made and that the suspect may terminate the interview at will.'" <u>Id</u>. at 826 (citing <u>United</u>

<u>States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir.1990)).  The Eighth Circuit noted that the defendant

in <u>Czichray</u> was informed "at least eight times that his participation in the interview was voluntary,

and that he was free to ask the agents to leave his home."  <u>Id</u>.  The Eighth Circuit stated

> [w]e believe that this abundant advice of freedom to terminate the encounter should
> not be treated as merely one equal factor in a multi-factor balancing test designed to
> discern whether a reasonable person would have understood himself to be in custody.
> That a person is told repeatedly that he is free to terminate an interview is powerful
> evidence that a reasonable person would have understood that he was free to
> terminate the interview.  So powerful, indeed, that no governing precedent of the
> Supreme Court or this court . . . holds that a person was in custody after being clearly
> advised of his freedom to leave or terminate questioning.

<u>Id</u>.  The Eight Circuit went on to state that

> [t]he weighty inference that [the defendant] was not in custody after receiving such
> advice is strengthened further by the context in which the interview occurred the--
> living room of [the defendant's] home.  When a person is questioned on his own turf
> . . . we have observed repeatedly that the surroundings are not indicative of the type
> of inherently coercive setting that normally accompanies a custodial interrogation.

<u>Id</u>.  (Internal citations and quotations omitted).

Looking at the totality of the circumstances, the Eighth Circuit determined that the defendant

in <u>Czichray</u> was not in custody.  The court noted that

> [t]here is no requirement . . . that the *Griffin* analysis be followed ritualistically in
> every *Miranda* case.  When the factors are invoked, it is important to recall that they
> are not by any means exclusive, and that 'custody' cannot be resolved merely by
> counting up the number of factors on each side of the balance and rendering a
> decision accordingly . . . The ultimate inquiry must always be whether the defendant
> was restrained as though he were under formal arrest.

<u>Id</u>. at 827-828.  In determining that the defendant in <u>Czichray</u> was not in custody, the Eighth Circuit

also noted that the fact that "a suspect is discouraged from using a telephone in his home during an

interview often is not probative of whether he is free to terminate the interview altogether . . . [in this

17

case the defendant] still retained two viable options: conduct an uninterrupted interview with the agents or terminate the interview." Id. at 828. The Eighth Circuit noted that "[a]gainst a backdrop of repeated advice that he was free to terminate the interview, Czichray's decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest." Id. at 829. The Eighth Circuit concluded by stating

> [w]here a suspect is questioned in the familiar surroundings of his home, and informed several times of his right to terminate the interview at will, we believe that strong evidence of restraint on freedom of movement of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial.

Id. at 830.

The present case is very similar to the facts in Czichray. In the present case, like in Czichray, Defendant was interviewed in his home. In the present case, like in Czichray, the Defendant was told at least four times by Officer Adrian that it was Defendant's decision whether or not to talk to Agent Adrian. In the present case, like in Czichray, Defendant was told that he was not under arrest, and he was not placed under arrest at the conclusion of the interview.

Applying the Griffin factors to the present case, and taking into account the guidance of the Eighth Circuit in Czichray, the Court concludes that Defendant was not in custody when he was questioned by Officer Adrian and Special Agent Begres. The first factor of the Griffin analysis asks the Court to consider "whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect is not considered under arrest." Griffin. 922 F.2d at 1349. In the present case Officer Adrian told Defendant at the beginning of the interview that neither he nor his wife were under

18

arrest.  (Ex. 4 at 1.)  Officer Adrian told Defendant that he did not have to talk to the officers about anything he chose not to, and that it was Defendant's choice "whether or not [he] wanted to be interviewed." (Ex. 4 at 1.)  Further on in the interview, before Defendant made any incriminating statements, Officer Adrian again asked Defendant if he wished to speak with Officer Adrian concerning the investigation.  (Ex. 4 at 17.)  Officer Adrian stated "again, reiterating, it has to be on a voluntary basis.  Its your decision.  It will be audio recorded . . . Whatever you tell me, unless you have committed a homicide somewhere . . . I don't, you're not going to be arrested." (Ex. 4 at 17.)  Officer Adrian further stated "What you say [unintelligible], you yourself is up to you, what you want to do." (Ex. 4 at 18.)

Therefore, in the present case, Defendant was clearly informed that he was not under arrest, and he was informed several times that the questioning was voluntary.  However, after Defendant was informed that he was not under arrest, Officer Adrian stated that the officers "would control [Defendant and his wife's] movements in the residence for obvious reasons until [the officers were] done with the search warrant." (Ex. 4 at 1.)  Therefore, Defendant was told that his movements would be controlled within the residence, but at no time was he told that he was not free to leave.  Although Defendant was told his actions would be controlled, Defendant still had the ability to terminate the interview at any time if he chose to do so.

Related to the first factor in the Griffin analysis, the second factor asks the Court to consider "whether the suspect possessed unrestrained freedom of movement during the questioning." Griffin, 922 F.2d at 1349.  In the present case, as noted above, Officer Adrian informed Defendant that his movements would be controlled within the residence during the execution of the search warrant. Defendant testified that, at the time he opened his car door and stepped out onto his lawn, an

unnamed police officer appeared and followed him as he entered his residence.  Defendant further testified that officers followed him around his house the entire time that the search was being conducted.  Defendant also testified that, at one point, he went to his office to get an ashtray so he could smoke a cigarette, and an unnamed officer asked him what he was doing, and followed him into the office to watch Defendant retrieve the ashtray, and then followed Defendant back to the living room.  On cross-examination at the suppression hearing, Defendant admitted that the office has a desk with drawers in which things could be concealed.

In the present case, although Defendant's movement was controlled insofar as he was shadowed by a police officer when he moved around his home, he was still able to make the choice of whether or not to move around within his home.  Officers did not restrict his access to parts of his home; they simply followed him when he did move throughout his home in order to insure the integrity of the search being conducted.  While Defendant's movements were somewhat restricted in the sense that he could not move about his home without an officer chaperone, he could freely move about his home with an officer looking on as he did so.

The third factor in the Griffin analysis asks the Court to determine "whether the suspect initiated contact with authorities or voluntarily acquiesced to respond to questions."  Griffin, 922 F.2d at 1349.  In the present case, Officer Adrian and Special Agent Begres were already at Defendant's home when he arrived and therefore he did not initiate contact with them.  However, Defendant did voluntarily acquiesce to Officer Adrian's requests to respond to questions.  As noted above, Officer Adrian informed Defendant several times that it was his choice whether or not he wanted to answer questions.  Officer Adrian notified Defendant at the beginning of the interview, and then again in the middle of the interview before Defendant made any incriminating statements,

20

that his wife had stated that she refused to answer any questions without an attorney present, and that Officer Adrian was honoring that request. (Ex. 4 at 1, 18.)  After Officer Adrian told Defendant that it was up to Defendant to choose what he wanted to do, Defendant responded "I guess I don't have a problem with talking with you, I guess.  'Cause I have the right not to answer a question."  (Ex. 4 at 18.)  Therefore it is clear that Defendant voluntarily acquiesced to the questioning by Officer Adrian.

At the suppression hearing, Defendant testified that he did not feel that he had a choice but to talk with Officer Adrian.  However, Defendant also testified that when Officer Adrian asked Defendant to consent to the interview, he said that Defendant could talk to him now or at the station or not talk.  Defendant testified that he interpreted this statement to mean that if he talked to Officer Adrian he may not be under arrest, but that if he refused to talk he would be taken downtown and arrested.  However, looking at all of the evidence, it appears clear from the record of the interrogation and from Defendant's testimony that Officer Adrian informed Defendant several times that he did not have to talk to Officer Adrian.  Whether or not Defendant believed he would be arrested if he refused to talk, the fact remains that Defendant's decision to talk to Officer Adrian was a voluntary one.

The next Griffin factor asks the Court to consider "whether strong arm tactics or deceptive stratagems were employed during the questioning." Griffin, 922 F.2d at 1349.  In the present case, Defendant testified that before Officer Adrian began tape recording the interview he said something to Defendant's wife to the effect that things look bad now, but they are about to get a lot worse, and that there was a lot Defendant's wife did not know about, and that her husband had been lying to her for a long time.  Defendant testified that he thought that Officer Adrian was trying to turn his wife

21

against him by making that statement.  However, other than this testimony, there is no evidence to suggest that Officer Adrian or Special Agent Begres employed strong arm tactics or deceptive stratagems during the interview of Defendant.  Therefore, this factor does not weigh in favor of a finding of custody.

The next <u>Griffin</u> factor asks the Court to consider " whether the atmosphere of the questioning was police dominated." <u>Griffin</u>, 922 F.2d at 1349.  In the present case, Officer Adrian testified that there were approximately ten law enforcement officers at Defendant's house at the time of the interview.  However, only Officer Adrian and Special Agent Begres conducted the interview with Defendant.  The other officers were engaged in searching the premises pursuant to the search warrant issue by the First Judicial District of the State of Minnesota.  Both Officer Adrian and Defendant testified that part of the interview was conducted at Defendant's kitchen table.  Officer Adrian testified that at the beginning of the interview he was questioning Defendant at the kitchen table, along with Special Agent Begres and Defendant's wife.  Officer Adrian testified that approximately two thirds of the interview was conducted in the kitchen.  Officer Adrian testified at some point Defendant's wife left the kitchen to assist the child protection workers in packing clothes for the children to leave pursuant to the 72 hour Health and Welfare hold.  Officer Adrian testified that when Defendant's wife returned from this task, Defendant no longer wanted to continue the interview in front of her, and that the interview was continued down in Defendant's basement.  Officer Adrian testified that Defendant sat on furniture in the basement and that he and Special Agent Begres remained standing.

In <u>Axsom</u> the Eighth Circuit faced a situation where there were nine agents and specialists in defendant's home during the time of the questioning, and only two of those persons were

22

conducting the interview of the defendant, while the rest were executing a search warrant on the premises.  289 F.3d at 502.  The Eighth Circuit noted that the defendant in Axsom sat on an easy chair and smoked his pipe while the interviewing officers sat opposite from him on a small sofa, and that the communication during the interview was two-way.  Id.  Based on those facts, the Axsom court determined that the district court erred in finding that the interview conducted with Axsom was police dominated.  Id.  In the present case, Defendant sat first at his kitchen table, and then on furniture in his basement.  He was able to smoke cigarettes when he wanted to, and he also engaged in two way conversation with the agents as he and his wife asked several questions regarding the procedure for taking the computers and the procedure for removing the children from the premises. As noted by the Eighth Circuit "[w]hen a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." Id.  In the present case, the fifth factor does not weigh in favor of a determination of custody.

The final Griffin factor asks the Court to determine "whether the suspect was placed under arrest at the termination of the questioning."  Griffin, 922 F.2d at 1349.  In the present case, Defendant was not placed under arrest until several days after the interview.

This case presents a very close and difficult question concerning the issue of custody. However, looking at the totality of circumstances in the present case, the Court determines that a reasonable person in Defendant's position would not believe that he was in custody at the time that Defendant made his statement.  The most important factors supporting a finding that Defendant was not in custody are that Defendant was told he was not under arrest before the questioning began, he was not placed under arrest at the conclusion of the interview, and he was told several times that he was free to refuse to answer questions.  After being told that his participation was voluntary

Defendant voluntarily agreed to speak with Officer Adrian.  While Defendant's movements were restricted in the sense that they were monitored by law enforcement, Defendant was permitted to move freely within his home, as long as he was escorted by a law enforcement official. Furthermore, he was informed twice that his wife had exercised her right to refuse to speak without an attorney, and that her decision was being honored.

As the Eighth Circuit stated, "[t]he ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." Czichray, 378 F.3d at 828.  In the present case, the fact that Defendant was told he was not under arrest before the interview began, and the fact that Defendant was not arrested at the conclusion of the interview, provide sufficient basis to conclude that Defendant was not "restrained as though he were under formal arrest." Id.  Therefore, the Court finds that Defendant was not in custody when he made the incriminating statements to Officer Adrian.

### 2.   Defendant's Statement Was Voluntary

Next, the Court must determine whether Defendant's statements were made voluntarily.  If the statements are induced by threats, promises, or in any other way in which the suspect's will is overborne, the statements are not voluntary and are inadmissible.  See Haynes v. Washington, 373 U.S. 503, 513 (1963).  The voluntariness inquiry centers upon: (1) the conduct of law enforcement officials in creating pressure; and (2) the suspect's capacity to resist that pressure.  United States v. Jorgenson, 871 F.2d 725,  729 (8th Cir.1989) (citing Colorado v. Connelly, 479 U.S. 157 (1986)). Coercion by a state actor is a necessary element in satisfying this test.  See Russell v. Jones, 886 F.2d 149, 151 (8th Cir.1989) (citing Connelly, 279 U.S. at 167).

In the present case, as noted above, Defendant was informed at least three times that it was

24

his decision whether or not to talk to Officer Adrian.  Defendant was informed that his wife exercised her right to refuse to speak to law enforcement without an attorney present, and Defendant was told that her decision was being honored.  Finally, and most importantly, Defendant himself stated that he would agree to speak because he had "the right not to answer a question."  (Ex. 4 at 18.)

Defendant's statement to Officer Adrian was not made while he was in custody and it was voluntary.  Since Defendant's statement was not made while he was in custody, Officer Adrian was not required to issue a <u>Miranda</u> warning to Defendant before obtaining the statement.  Since the statement was voluntary and was not made in violation of <u>Miranda</u>, the incriminating statements Defendant made therein are admissible.

### III.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Any Evidence Obtained As A Result Of Any Illegal Searches [#18] and Defendant's Motion To Suppress Any Statements Made By Defendant[#20] are denied.

DATED: January 13, 2006                    s/ *Franklin L. Noel*_____
                                           FRANKLIN L. NOEL
                                           United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 2, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **February 2, 2006,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.